## NONCONFIDENTIAL

## NO. 15-5130

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

————

TRANSATLANTIC LINES, LLC,

*Plaintiff-Appellant*,

*v*.

UNITED STATES,

*Defendant-Appellee*.

————

On appeal from the United States Court of Federal Claims
Case No. 15-689C, Hon. Patricia E. Campbell-Smith, Chief Judge

**CORRECTED BRIEF OF PLAINTIFF-APPELLANT
TRANSATLANTIC LINES, LLC**

Paul M. Honigberg
Blank Rome LLP
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 772-5800
Honigberg@BlankRome.com

*Attorney for Plaintiff-Appellant*

*Of Counsel:*

Michael Joseph
Alex Blanton
Blank Rome LLP
600 New Hampshire Ave., NW
Washington, DC 20037

October 6, 2015

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

TransAtlantic Lines, LLC v. United States

Case No. 15-5130

CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant TransAtlantic Lines, LLC, certifies the following (use "None" if applicable):

1.  The full name of every party or amicus represented by me is TransAtlantic Lines, LLC.

    The party named in the caption is the real party in interest.

2.  All parent corporations and any publicly held companies that own 10% or more of such party:

    TransAtlantic Lines Holding, Inc.

3.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    **Blank Rome LLP**
    Alex Blanton
    Brian S. Gocial
    Paul M. Honigberg
    Michael Joseph
    Albert B. Krachman
    Kendra P. Norwood

October 6, 2015

/s/ Paul M. Honigberg
Paul M. Honigberg
Attorney for Plaintiff-Appellant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF RELATED CASES ..................................................... v

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ................................................................ 2

SUMMARY OF THE ARGUMENT ....................................................... 7

ARGUMENT .......................................................................................... 8

    I.    Standard of Review ................................................................. 8

    II.    The Trial Court Erroneously Concluded That TRANSCOM
        Rationally Rated Schuyler's Technical Proposal as Acceptable. ......... 9

        A.    The Agency Did Not Recognize, Much Less Purport to
            Analyze and Resolve, the Frequency-of-Sailing Problem
            Created by Schuyler's Proposal. ............................................... 11

        B.    The Trial Court's Analysis Fails to Support Its
            Conclusion that Schuyler's Proposed 16-day Interval Did
            Not Run Afoul of the Solicitation's 14-Day Requirement. ....... 13

            1.    Schuyler's "Primary" and "Alternative" Vessel
                  Designations. ................................................................. 13

            2.    The Two Schedules Viewed Separately. ........................ 16

            3.    The Requirements for Recording and Changing
                  Schedules. ..................................................................... 16

            4.    The "Sample" and "Proposed" Schedule
                  Descriptions. ................................................................. 17

CONCLUSION ....................................................................................... 19

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on page 12 describes a statement made in a declaration by the Chairman of the United States Transportation Command's Technical Evaluation Team, and the material omitted on page 15 n.4 also describes a statement made in the same declaration, both of which are subject to the Protective Order entered in the United States Court of Federal Claims.

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Advanced Data Concepts, Inc. v. United States,*
  216 F.3d 1054 (Fed. Cir. 2000) ..........................................................8

*Alabama Aircraft Indus. Inc. v. United States,*
  586 F.3d 1372 (Fed. Cir. 2009) ..........................................................9

*Bannum, Inc. v. United States,*
  404 F.3d 1346 (Fed. Cir. 2005) ..........................................................8

*Centech Group, Inc. v. United States,*
  554 F.3d 1029 (Fed. Cir. 2009) ..........................................................8

*E.W. Bliss Co. v. United States,*
  77 F.3d 445 (Fed. Cir. 1996). ..............................................................9

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
  238 F.3d 1324 (Fed. Cir. 2001) ..........................................................8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)................................................................................9

*OMV Med., Inc. v. United States,*
  219 F.3d 1337 (Fed. Cir. 2000) ........................................................13

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943)..............................................................................13

*Weeks Marine, Inc. v. United States,*
  575 F.3d 1352 (Fed. Cir. 2009) ..........................................................8

S<small>TATUTES</small>

5 U.S.C. § 706 ............................................................................................8

10 U.S.C. § 2305(b)(1)................................................................................9

28 U.S.C. § 1295(a)(3)................................................................................1

28 U.S.C. § 1491(a)(4).............................................................................8

28 U.S.C. § 1491(b)(1).............................................................................1

**OTHER AUTHORITIES**

48 C.F.R. § 15.305(a)..............................................................................9

## STATEMENT OF RELATED CASES

There are no related cases.

NONCONFIDENTIAL

NO. 15-5130

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

————

TRANSATLANTIC LINES, LLC,

*Plaintiff-Appellant*,

*v.*

UNITED STATES,

*Defendant-Appellee*.

————

**BRIEF OF PLAINTIFF-APPELLANT
TRANSATLANTIC LINES, LLC**

————

**JURISDICTIONAL STATEMENT**

This is an appeal from a final judgment of the United States Court of Federal Claims in a post-award bid protest action, of which that court had jurisdiction under 28 U.S.C. § 1491(b)(1). The trial court entered its final judgment on July 31, 2015, ECF No. 30, and plaintiff-appellant filed a timely notice of appeal on August 10, 2015, ECF No. 35. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

**STATEMENT OF THE ISSUES**

In a Solicitation for regularly scheduled commercial ocean liner service between Jacksonville, Florida and the U.S. Naval Station at Guantanamo Bay,

Cuba (GTMO), the United States Transportation Command (TRANSCOM)

required proposals to include a proposed schedule that provided northbound

service (GTMO to Jacksonville) at a frequency of no more than 14 days. The

question presented is whether the Court of Federal Claims erred in determining

that TRANSCOM rationally concluded that a proposed schedule that permitted

16 days between sailings from GTMO clearly met that 14-day requirement.

## STATEMENT OF THE CASE

Plaintiff-Appellant, TransAtlantic Lines, LLC, is the unsuccessful offeror for

a government contract. Following award of the contract to its competing offeror,

and the U.S. Government Accountability Office's rejection of its protest,

TransAtlantic filed an action in the Court of Federal Claims, seeking invalidation

of the award. TransAtlantic here appeals from that court's final judgment in favor

of defendant on the parties' cross-motions for judgment on the administrative

record. On August 25, 2015, this Court denied TransAtlantic's motion for stay and

injunction pending appeal (ECF No. 30), and the successful offeror has begun

performing the contract.

This case, as noted, involves TRANSCOM's solicitation for proposals to

provide regularly scheduled commercial ocean liner service between Jacksonville,

Florida and the U.S. Naval Station at Guantanamo Bay. Among the several factors

that offerors had to satisfy was their "Technical Capability," and a proposal failing

to satisfy any one of its three technical-capability evaluation sub-factors would be deemed unacceptable. The sub-factor here involved is the frequency-of-service requirement: that the contractor's vessel would sail from each port on a fixed day every two weeks—specifically, that the interval between sailings from either port could not exceed 14 days.

**The Solicitation.** Solicitation No. HTC711-14-R-W001 invited offers to provide "[r]egularly scheduled commercial liner transportation of containerized and break bulk cargo between Jacksonville/Blount Island, Florida . . . and U.S. Naval Station Guantanamo Bay, Cuba (GTMO)" for one year, with two one-year renewal options. JA 3 (citing AR 182). Offerors were to be evaluated based on five factors: (1) Voluntary Intermodal Sealift Agreement (VISA) participation, (2) technical capability, (3) past performance, (4) information assurance and cyber security and (5) price. After assigning preference to offerors that were VISA participants, the agency would assign a rating of "Acceptable" or "Unacceptable" as to each of factors (2), (3) and (4). The agency would then evaluate the prices of those offerors deemed acceptable in each of those factors, and the contract would be awarded to the lowest-priced responsible offeror "meeting or exceeding the requirements" of those factors. JA 26-27.

The Technical Capability factor was comprised of three sub-factors: equipment, operations management, and schedule. JA 28. An "Unacceptable"

3

rating as to any of the three would result in an overall technical-capability rating of

"Unacceptable," and an "Unacceptable" rating would be assigned if the proposal

did not "clearly meet the minimum requirements of the solicitation." JA 28.

The schedule requirements of the technical-capability factor, set out in the

Performance Work Statement (PWS), provided,

> The Contractor shall maintain a scheduled service
> northbound GTMO to Jacksonville/Blount Island. *Frequency of
> such service must be, at a minimum, every 14 calendar days.
> Sailings shall be on a fixed-day-of-the-week basis, on a fixed day
> selected by the Contractor*. . . .

JA 30 (emphasis added).[1] Each offeror was required to "submit a proposed liner

schedule that meets the departure, arrival and transit requirements as specified

in . . . the PWS." JA 25.

**Schuyler's Proposal.** TransAtlantic and Schuyler Line Navigation

Company, LLC, were the only two offerors. Schuyler, the successful offeror,

proposed to provide the service using two vessels interchangeably: the *EOT Spar*,

a self-propelled roll-on/roll-off cargo vessel, and the *Columbia Houston*, a tug-and-

barge combination. JA 33-38. While Schuyler described the former as its

"primary" vessel and the latter as its "alternative" vessel, its proposal included

no restriction, limitation or condition as to the interchangeability of the two

---

[1] Though not involved here, the PWS included an identical 14-day
frequency-of-departure requirement for the southbound leg.

vessels. It proposed one sailing schedule "using the EOT Spar" and a second schedule for "[w]hen the barge Columbia Houston is used." JA 40-42.

Schulyer's proposed schedule for the *EOT Spar* showed the vessel departing Jacksonville on Friday, arriving at GTMO three days later (Monday), departing GTMO the next day (Tuesday), and arriving at Jacksonville ten days later (Thursday)—after calling at Port-Au-Prince, Haiti and Norfolk, Virginia for business unrelated to the TRANSCOM cargo—in time for the next regular Friday departure from Jacksonville. JA 41-42. The proposed schedule thus established every other Friday as Schuyler's fixed departure day from Jacksonville, and every other Tuesday as its fixed departure day from GTMO.

The proposed schedule for the *Columbia Houston* similarly showed the vessel departing Jacksonville on Friday, but, because the tug/barge is substantially slower than the *EOT Spar*, not arriving at GTMO until Wednesday, the day after the established regular Tuesday departure date, and not departing GTMO until Thursday, two days after the regular departure date. JA 42. Thus, according to Schuyler's proposed schedules, whenever the *Columbia Houston* is substituted for the *EOT Spar*, the northbound GTMO departure will be 16 days after the previous one, rather than 14 days as required by the Solicitation.

**The Contract Award.** TRANSCOM's Source Selection Evaluation Board found both TransAtlantic's and Schuyler's proposals acceptable with respect to all

5

the non-price factors and sub-factors. TRANSCOM awarded the contract to Schuyler because Schuyler's price proposal was lower.

**The Decision of the Court of Federal Claims.** TransAtlantic argued to the trial court that Schuyler's proposal did not clearly meet the schedule requirements of the Solicitation's technical-capability factor and should therefore have been found unacceptable. TransAtlantic argued that Schuyler's proposal failed to comply with the Solicitation's scheduling requirement because it proposed inconsistent departure days for the *EOT Spar* and a different departure day entirely for the *Columbia Houston*—both contrary to the "fixed" departure-date requirement of the Solicitation—and, most significantly, because Schuyler's proposed schedule could not meet the required 14-day northbound departure frequency when switching from the self-propelled vessel to the tug/barge. The court rejected these arguments, concluding that the contracting agency rationally rated Schuyler's technical proposal as acceptable. JA 11.

With respect to Schuyler's different northbound departure days and sailing frequency for its two vessels, the court had only this to say:

> [R]eading both the Solicitation and Schuyler's proposal as a whole, the court finds that Schuyler's use of slightly different schedules for its primary and back-up vessels was not inconsistent with the material terms of the Solicitation. That is, the fact that Schuyler's proposed schedules for the EOT Spar and Columbia Houston have different northbound sailing days does not run afoul of the Solicitation's schedule requirement that northbound sailings take place on a fixed day of the week. Nor does the fact that more than fourteen days may

6

> pass between northbound sailings when both the EOT Spar and the
> Columbia Houston are used in succession run afoul of the
> Solicitation's requirement that the frequency of the sailings occur at
> least every fourteen days.

JA 14. The opinion nowhere explains how the 14-day-frequency requirement is

thus met when the offeror's schedule provides for a 16-day interval.

### SUMMARY OF THE ARGUMENT

It is indisputable that the Solicitation's frequency-of-service requirement

was material and that Schuyler's proposed schedules demonstrate that Schuyler

will necessarily exceed the 14-day limit on its northbound leg every time it

employs its tug/barge following its self-propelled vessel. The contracting agency's

determination that Schuyler's proposal was acceptable notwithstanding this issue

cannot be sustained on the basis of the agency's reasoning, because, as the trial

court recognized, there is no indication that the agency recognized or addressed the

issue. Although the court nevertheless concluded that the 14-day requirement

would be satisfied even when Schuyler's northbound departure does not occur until

16 days following the last one, the court's reasoning leading to this conclusion is

unclear. To the extent that its opinion discusses various factors related to

Schuyler's vessels and schedules, the opinion either draws unwarranted inferences

from the facts or discusses facts that are irrelevant to the frequency-of-service

requirement.

## ARGUMENT

## I.    Standard of Review

This Court reviews the Court of Federal Claims' determination in a bid

protest action "without deference." *Bannum, Inc. v. United States*, 404 F.3d 1346,

1351 (Fed. Cir. 2005). The Court thus applies the "arbitrary and capricious"

standard prescribed in section 706 of the Administrative Procedure Act (APA),

5 U.S.C. § 706, "anew, conducting the same analysis as the Court of Federal

Claims." *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir.

2009) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*,

238 F.3d 1324, 1332 (Fed. Cir. 2001)); *see* 28 U.S.C. § 1491(a)(4) (directing the

Court of Federal Claims to review the contracting agency's action using the

standards prescribed in § 706 of the APA).

In applying the APA standard to protests, the Court determines whether

"(1) the procurement official's decision lacked a rational basis; or (2) the

procurement procedure involved a violation of regulation or procedure." *Weeks

Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009); *Centech*,

554 F.3d at 1037 (citing *Impresa Construzioni*, 238 F.3d at 1332). If the agency's

action "evinc[es] rational reasoning and consideration of relevant factors," the

court will sustain the action. *Advanced Data Concepts, Inc. v. United States*,

216 F.3d 1054, 1058 (Fed. Cir. 2000). Conversely, if the agency "'entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,'" its decision will be set aside. *Alabama Aircraft Indus. Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Agencies must evaluate proposals and make awards "based solely on the factors specified in the Solicitation." 10 U.S.C. § 2305(b)(1); *see also* FAR § 15.305(a), 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996).

## II.    The Trial Court Erroneously Concluded That TRANSCOM Rationally Rated Schuyler's Technical Proposal as Acceptable.

The single issue presented on this appeal is whether TRANSCOM reasonably found that Schuyler's proposal clearly met the Solicitation's requirement that sailings from GTMO occur no less frequently than every 14 days, which, as the trial court correctly concluded, was material. JA 12. The Solicitation

9

did not say that sailings should occur approximately every two weeks; it required that the offeror's proposed schedule show that departure frequency from each port would be "at a minimum, every 14 calendar days." JA 25, 30. Schuyler's proposal did not clearly meet that frequency-of-service requirement and therefore should have been rated "Unacceptable." The agency's finding that Schuyler's proposal was "Acceptable" in this regard and the trial court's conclusion that that rating was reasonable should be reversed.

The court was correct in concluding that the Solicitation's frequency-of-sailing requirement was a material term, because the Solicitation itself makes this requirement material. First, frequency of sailing from GTMO is a minimum requirement in Subfactor C, "Schedule," of the Solicitation's Technical Capability Factor. JA 25-26. Second, a proposal that "does not clearly meet the minimum requirements of each of the solicitation's three "Technical Capability" sub-factors is to be rated as "unacceptable." JA 28. Third, a proposal that is rated "unacceptable" is not eligible for award. JA 24.

While the court observed that, under Schuyler's proposal, "more than fourteen days *may pass* between northbound sailings when [Schuyler's primary and alternative] vessels are used in succession," JA 14 (emphasis added), more than 14 days *will necessarily pass* between sailings from GTMO every time the *Columbia Houston*, Schuyler's tug/barge, is substituted for the *EOT Spar*, its self-

10

propelled cargo ship. As demonstrated by Schuyler's proposed schedules for its two vessels (JA 41-42), on a round trip starting in Jacksonville and performed by the *EOT Spar*, the sailing from GTMO will occur on a Tuesday. If the next round trip starting in Jacksonville is performed by the *Columbia Houston*, the next sailing from GTMO will occur sixteen days later, on a Thursday. The resulting unacceptable interval between northbound sailings is caused by the *Columbia Houston*'s slower speed and will occur whether the substitution occurs, and subsequent round trip begins, in Jacksonville or GTMO. And, as explained below, the unacceptable frequency of service will occur as often as Schuyler, in its discretion, chooses to make its primary vessel "unavailable."

Inexplicably, the court nonetheless concluded that (1) the lapse of sixteen days between sailings does not "run afoul of the Solicitation's requirement that the frequency of the sailings occur at least every fourteen days" (JA 14); and (2) that the agency reasonably found that, despite this issue, Schuyler's proposal clearly met the minimum requirements of the solicitation's schedule sub-factor (JA 16). Both of these conclusions are wrong and must be reversed.

### A.    The Agency Did Not Recognize, Much Less Purport to Analyze and Resolve, the Frequency-of-Sailing Problem Created by Schuyler's Proposal.

Despite the court's conclusion that the agency reasonably determined that Schuyler's scheduling proposal was acceptable notwithstanding the frequency-of-

CONFIDENTIAL MATERIAL REDACTED ON THIS PAGE

service problem caused by Schuyler's proposed use of two vessels, the record

discloses that TRANSCOM did not even recognize that Schuyler's proposal raised

a frequency-of-service issue.

As noted by the court (JA 14) and discussed below, the agency's Technical

Evaluation Team did note, correctly, that the proposed schedule for each of the two

vessels individually met the schedule requirements, including frequency of service.

JA 80. Nowhere in TRANSCOM's evaluation of Schuyler's proposal, however,

did anyone at the agency recognize that, when Schuyler chose to substitute the

tug/barge for the cargo ship, the interval between sailings from GTMO would

necessarily exceed the 14-day maximum specified in the solicitation. JA 44-114

(Technical Evaluation Team Report, which observes that both of Schuyler's two

schedules meet the Solicitation requirements, but nowhere evidences any

recognition that the two schedules combined do not meet the frequency-of-sailing

requirement). In his post-selection declaration, the chairman of the Technical

Evaluation Team confirmed that ███████████████████████████████████

███████████.[2] JA 118. The agency simply did not address the frequency-of-

---

[2]  Pursuant to Fed. Cir. R. 28(d)(1)(A), Plaintiff-Appellant has shaded
"confidential" material.

12

service problems created by Schuyler's proposal, let alone determine that its proposal clearly met the schedule requirements despite these problems.

That failure alone provides a sufficient basis for overturning the agency's action. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *see also OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (applying *Chenery* in a bid protest case).

**B.     The Trial Court's Analysis Fails to Support Its Conclusion that Schuyler's Proposed 16-day Interval Did Not Run Afoul of the Solicitation's 14-Day Requirement.**

It is not clear by what path the trial court reached its conclusion that a lapse of 16 days between northbound sailings would not run afoul of the requirement that not more than 14 days could elapse. Although the court discussed several aspects of Schuyler's schedules, none of them supports its conclusion, as next shown.

**1.     Schuyler's "Primary" and "Alternative" Vessel Designations.**

The court seemed to place some significance on Schuyler's designation of its cargo ship as the "primary" vessel and of its tug/barge as the "alternative" or "backup" vessel (JA 14, citing JA 32, 33, 38) and in the Technical Evaluation Team's parroting of those terms (JA 15, citing JA 48, 56, 80). The court apparently placed even more importance on Schuyler's assertion that the tug/barge would be

13

used "as required to [e]nsure uninterrupted service to GTMO" (JA 14, citing JA 40-41) and the evaluation team's "acknowledg[ment] that the [tug/barge] would be used only if the [cargo ship] was unavailable" (JA 15, citing JA 56). The court apparently concluded from this language that a switch between vessels would be rare, *i.e.*, the "primary" cargo ship would be used almost all the time, and the "alternative" tug/barge would be used only when the primary vessel was "unavailable" in the sense of its having been subjected to some force beyond Schuyler's control.

These various terms, however, serve only to disguise the degree to which Schuyler's proposal gives it the discretion to use whichever vessel served its financial interest from time to time. There is nothing in either Schuyler's proposal or the evaluators' report that supports a finding that Schuyler's substitution of the tug/barge for the cargo ship would be rare. Nowhere does Schuyler's proposal limit the circumstances under which it might make its cargo ship "unavailable" or limit substitution of the tug/barge to unforeseen contingencies. And, as shown in the declaration of TransAtlantic's vice president, in commercial shipping, a common reason for a vessel's being unavailable for a given service is that it is being used for some other, perhaps more lucrative, service. JA 126 ¶ 4.

Indeed, the most reasonable explanation for Schuyler's introduction of the concept of an "alternative" vessel into its proposal—an unnecessary, complicating

CONFIDENTIAL MATERIAL REDACTED ON THIS PAGE

factor—is that it sought to reserve a right to offer its self-propelled cargo vessel in response to other solicitations, either government or private, that might come along.[3] JA 125-26 ¶¶ 3-4. Thus, whether or not Schuyler reserved the right to switch vessels "at whim" (*see* the court's discussion at JA 15), it most certainly did reserve the right to substitute its alternative vessel (the tug/barge) at any time it elected to make the primary vessel available for another opportunity.[4] It can use the *EOT Spar* on the Jacksonville-GTMO-Haiti-Norfolk-Jacksonville route whenever cargo bookings for Haiti and Norfolk make it economically advantageous to do so. Whether or not those bookings are robust, it can from time to time substitute the

---

[3] Specifying an alternative vessel was certainly not necessary to provide for the unavailability of the *EOT Spar* because of an emergency or need for maintenance or repair. TransAtlantic's proposal, which did not include an alternative vessel, was rated as "Acceptable." TransAtlantic and Schuyler both know that a provider of commercial liner services is, by necessity, permitted to substitute a suitable alternative vessel for one that becomes unavailable because of a need for repairs or maintenance. JA 125 ¶ 3. That is the primary purpose of paragraph 3.H.12 of the Solicitation, which permits the Contractor to seek approval for material changes in service on a routine or emergency basis. JA 31.

[4] In his post-selection declaration, the chairman of the Technical Evaluation Team ███████████████████████████████████████. JA 118. Schuyler, via its Web site and its ship broker service, Dome Chartering and Trading, continues to market its *EOT Spar* for service to West Africa and the Caribbean. *See* http://schuylerline.com (listing *EOT Spar* as available to perform either service); domechartering.com/our-fleet.

slower *Columbia Houston* on the Jacksonville-GTMO-Jacksonville route and use the *EOT Spar* on other, more lucrative routes. And every time it makes such a substitution, it will be unable to comply with the Solicitation's requirement that the time between sailings from GTMO be no more than 14 days. Its proposal thus did not clearly meet the minimum requirements of the schedule sub-factor—indeed, it clearly did not meet them—and should have been rated as "Unacceptable" and declared ineligible for the award.

## 2.    The Two Schedules Viewed Separately.

The court observed, correctly, that each of Schuyler's schedules, when considered separately, satisfied the 14-day frequency-of-sailing requirement. JA 14. But Schuyler did not propose to use one or the other of its vessels to perform the entire contract; it proposed to use both interchangeably: the cargo ship when it was available, and the tug/barge when the former was unavailable. As the court (but not the agency) recognized, it is this switch between the vessels that causes the frequency-of-service problem. JA 12. The fact that each schedule viewed separately meets the 14-day requirement is thus irrelevant.

## 3.    The Requirements for Recording and Changing Schedules.

The court seemed to suggest (JA 15) that the Solicitation's requirement that the contractor participate in TRANSCOM's Integrated Booking System (IBS) somehow authorized noncompliance with the Solicitation's frequency-of-sailing

16

requirement. The IBS is the system TRANSCOM uses to manage the global shipment of ocean cargo in support of all DOD operations. Contractors providing ocean transportation services to the government are required to participate in it so government shippers will know when and where shipping services are available. It does not, and cannot, authorize prospective contractors to deviate from solicitation requirements. Similarly, the contractor's obligation to report "slippages" in its schedule (*see* JA 15, citing JA 30) does not affect the question of whether a proposed schedule meets the Solicitation's minimum requirements. Nothing that the PWS says about the ability of a contractor to change its schedule *during the performance of the contract* can change the Solicitation requirement that an offeror (prospective contractor) "must submit a . . . schedule that meets the requirements as specified in . . . the PWS." JA 25.

### 4. The "Sample" and "Proposed" Schedule Descriptions.

The court observed that the Solicitation did not require contractually binding liner schedules, but only "proposed" schedules, and that TRANSCOM's evaluators treated them as "sample" schedules, as Schuyler had described them. JA 17. As the court recognized (*id.*), the Solicitation instructed offerors to submit "a proposed liner schedule that meets the departure, arrival and transit requirements [of] . . . the PWS" and advised that the agency would determine whether they met the technical

capability factor by examining whether "the information provided" demonstrates the offeror's ability to provide the required service.

The question here is what the Solicitation required of all offerors, not what the subsequent contract might require of the successful offeror. The offerors' "proposed" schedules, thus, were the only basis the agency had for deciding whether proposals were acceptable or unacceptable with respect to the schedule requirement. It could not lawfully ignore the failure of an offeror's schedule to satisfy the requirement by treating it as something less than the schedule that the offeror intended to follow if awarded the contract. And the fact that Schuyler called its schedules "sample" schedules could not turn them into something even less than its proposed schedules; if they were not its proposed schedules then its proposal was unacceptable for failing the comply with the instructions of the Solicitation.

\* \* \* \*

There can be no doubt that Schuyler's proposal would have been rated "Unacceptable" if it had expressly said, "Schuyler will provide liner service between Jacksonville and GTMO using the *EOT Spar* with sailings from GTMO every 14 days, but we reserve the right to divert the *EOT Spar* to other, more lucrative, routes and substitute our tug/barge; and every time we do that the interval between sailings from GTMO will be 16 days." In essence, that is what it

did say, as it is undeniable that Schuyler's proposal includes no restriction,

limitation or condition on the interchangeability of the two vessels. To conclude

that Schuyler is not likely to divert the *EOT Spar* to other opportunities is to ignore

economic reality.

### CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims

should be reversed and the case remanded to the court with instructions to direct

the agency to terminate the contract with Schuyler and award it to TransAtlantic,

the only other offeror whose proposal was rated as acceptable.

DATED:  October 6, 2015

Respectfully submitted,

/s/ Paul M. Honigberg
Paul M. Honigberg
Blank Rome LLP
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 772-5955
Honigberg@BlankRome.com

*Attorney for Plaintiff-Appellant*

*Of Counsel:*

Michael Joseph
Alex Blanton
Blank Rome LLP
600 New Hampshire Ave., NW
Washington, DC 20037

# ADDENDUM

# In the United States Court of Federal Claims

**No. 15-689 C**

**TRANSATLANTIC LINES, LLC**

**JUDGMENT**

    **v.**

**THE UNITED STATES**

        Pursuant to the court's Opinion and Order, filed July 31, 2015, denying plaintiff's motion for judgment on the administrative record and granting defendant's motion for judgment on the administrative record,

        IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant. No costs.

                    Hazel C. Keahey
                    Clerk of Court

**July 31, 2015**        By:    s/ Debra L. Samler

                    Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 15-689C

(E-Filed: August 10, 2015)[1]

|  |  |  |
|---|---|---|
| TRANSATLANTIC LINES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Post-Award Bid Protest; Cross- |
| v. | ) | Motions for Judgment on the |
| | ) | Administrative Record; |
| THE UNITED STATES, | ) | Technical Proposal Evaluation |
| | ) | |
| Defendant. | ) | |
| | ) | |

Brian S. Gocial, Philadelphia, Pa., for plaintiff.

Alexander V. Sverdlov, Trial Attorney, with whom were Benjamin C. Mizer, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This case involves a post-award bid protest filed by TransAtlantic Lines, LLC (TransAtlantic or plaintiff). TransAtlantic challenges the decision of the United States Transportation Command[2] (TRANSCOM, the agency, or defendant) to award a contract

---

[1]     This Opinion was originally filed under seal on July 31, 2015. ECF No. 29. The court requested the parties to file a motion by Friday, August 7, 2015, if either party believed that the Opinion should be redacted. Having received no requests for redactions, the Opinion is reported in its entirety.

[2]     The United States Transportation Command "is a unified, functional combatant command which provides support to the eight other U.S. combatant commands, the military services, defense agencies and other government organizations." U.S.

for commercial liner service to Schuyler Line Navigation Company, LLC (Schuyler). TransAtlantic contends that Schuyler's technical proposal failed to comply with certain material terms of the Solicitation and, therefore, Schuyler's proposal should have been excluded from consideration for award. Because TransAtlantic was the only other offeror, and because TransAtlantic's proposal complied with the terms of the Solicitation, TransAtlantic argues that it should have been awarded the contract.

The parties submitted cross-motions for judgment on the administrative record (AR) in accordance with United States Court of Federal Claims Rule (RCFC) 52.1(c).[3] See Pl.'s Mot. J. AR (Pl.'s Mot.), July 1, 2015, ECF No. 9[4]; Def.'s Mot. J. AR (Def.'s Mot.), July 9, 2015, ECF No. 23; see also Pl.'s Resp., July 14, 2015, ECF No. 26; Def.'s Reply, July 21, 2015, ECF No. 28. Oral argument was not deemed necessary.

For the reasons explained below, the court finds that Schuyler's technical proposal complied with the material terms of the Solicitation. Accordingly, plaintiff's motion is **DENIED**, and defendant's motion is **GRANTED**.

I.    Background

A.    Solicitation

On September 10, 2014, TRANSCOM issued Solicitation HTC711-14-R-W001. See Tab 15, AR 131–289 (Solicitation).[5] The Solicitation sought "regularly scheduled commercial liner service" of containerized and breakbulk cargo between Jacksonville/Blount Island, Florida and United States Naval Station Guantanamo Bay, Cuba (GTMO). Id. at AR 182; see id. at AR 221 (defining "[r]egularly [s]cheduled" as

---

Transportation Command, About USTRANSCOM, http://www.transcom.mil/about/whatIs.cfm (last visited July 27, 2015).

[3]    Defendant filed the administrative record (AR) under seal on July 9, 2015 in the form of a CD-ROM. See ECF No. 24.

[4]    The court cites to plaintiff's memorandum in support of its motion for preliminary injunction, ECF No. 9, which was converted on July 6, 2015 to a motion for permanent injunction and for judgment on the administrative record, ECF No. 13.

[5]    TRANSCOM issued two amendments to the Solicitation, neither of which is relevant to this protest. See Tab 17, AR 299–305 (Am. 1); Tab 19, 308–75 (Am. 2).

"[s]ailing at regular intervals maintained between the same port ranges and consisting of regular arrivals, regular departures along an established route"). The Solicitation was designated as a small business set-aside, id. at AR 131, and contemplated the award of a firm-fixed price requirements contract[6] for a base year and two option years, see id. at AR 133–35, 165.

The Solicitation provided that the procurement would be conducted as a best value, lowest-priced technically acceptable (LPTA) source selection. Id. at AR 141; see FAR 15.101-2 (2014) (describing the LPTA source selection process). Offerors were instructed "to meet all solicitation requirements, including terms and conditions, representations and certifications, and technical requirements in the [Performance Work Statement (PWS)]." Tab 15, AR 137. Offerors were also advised that "[t]he [g]overnment reserves the right to . . . incorporate all, part or none of the offeror's written proposal into the resultant contract." Id.

Offerors were to be evaluated based on five factors: (1) Voluntary Intermodal Sealift Agreement (VISA) participation, (2) price, (3) technical capability, (4) past performance, and (5) information assurance and cyber security. Id. at AR 142. After assigning preference to offerors that were VISA participants, the agency would assign a rating of acceptable or unacceptable to the technical capability, past performance, and information assurance and cyber security factors. Id. at AR 141. The agency would then evaluate the prices of those offerors deemed acceptable. Id. An "[a]ward [would] be made to the lowest priced responsible offeror meeting or exceeding the requirements for technical capability, past performance, information assurance and VISA participation." Id.

The Solicitation provided that the agency would evaluate the technical capability factor by examining "the degree to which the information provided by the offeror in its proposal demonstrates the offeror's ability to provide the equipment and resources needed to successfully accomplish the objectives of the [PWS], as well as manage, supervise, and perform the required services in accordance with the PWS." Id. at AR 143. The technical capability factor was comprised of three sub-factors, and an

---

[6]     "A requirements contract provides for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period (from one contractor), with deliveries or performance to be scheduled by placing orders with the contractor." FAR 16.503(a) (2014). "[A] requirements contract necessarily obligates the Government to purchase exclusively from a single source." Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1305 (Fed. Cir. 1998).

unacceptable rating as to any of the three sub-factors would result in an overall technical rating of unacceptable.  Id.  An acceptable rating would be assigned if the "[p]roposal clearly [met] the minimum requirements of the solicitation," whereas an unacceptable rating would be assigned if the proposal did not "clearly meet the minimum requirements of the solicitation."  Id.

Offerors were instructed to "submit written narratives for evaluation of technical capability."  Id. at AR 140.  The written narratives were to "demonstrate the offeror's understanding of the requirements identified in the [PWS]," id. at AR 141, and "explain how the offeror [would] meet all requirements established in the solicitation," id. at AR 140.  Offerors were to include written narratives for each of the three technical capability sub-factors:  (1) equipment, (2) management of operations, and (3) schedule.  Id.

Under the equipment sub-factor, offerors were instructed to "identify the vessel(s) . . . to be utilized for this contract."  Id.  Under the management of operations sub-factor, offerors were instructed to provide a "[c]ompany overview and description of current operations in the region or ability to operate in the region."  Id.  Under the schedule sub-factor offerors were instructed as follows:

> [S]ubmit a proposed liner schedule that meets the departure, arrival, and transit requirements as specified in paragraph Section 3.B.4 of the PWS beginning the week of 1 February 2015.  Provide the proposed southbound and northbound delivery routes to include other vessel ports of call.  Describe how the delivery requirements in the PWS will be incorporated into [the] offeror's current liner schedule or whether offeror will establish a new/additional liner route.

Id. (emphasis added).

Section 3.B.4 of the PWS is entitled "Schedule Maintenance."  Id. at AR 184.  It includes two sub-sections that detail the schedule requirements for southbound and northbound sailings.  Id.  Only the northbound schedule requirements are at issue in this protest:

> The Contractor shall maintain a scheduled service northbound[,] GTMO to Jacksonville/Blount Island.  Frequency of such service must be, at a minimum, every 14 calendar days.  Sailings shall be on a fixed-day-of-the-week basis, on a fixed day selected by the Contractor.  Transit time from GTMO to Jacksonville/Blount Island is a maximum of 18 calendar days.

4

Id. (emphasis added); cf. Pl.'s Resp. 3 (characterizing two of the northbound schedule requirements—that "(1) the sailings from each port had to be scheduled on a 'fixed-day-of-the-week'; and [that] (2) the liner service had to depart from each port at least every 14 days"—as "central to the present action"); Pl.'s Mot. 8 (similar).

Section 3.B.4 of the PWS also required contractors to "provide and continually maintain vessel schedules in the Integrated Booking System (IBS) at least 45 calendar days in advance of the vessel sail date." Tab 15, AR 184. The PWS contemplated that schedule changes might occur. If the contractor anticipated a change in the vessel schedule, the contractor was instructed to notify the ordering officer and update the schedule in the IBS within seven calendar days prior to the next scheduled port call. Id. If the contractor anticipated a "slippage in scheduled sailing date/arrival date by more than one . . . calendar day," the contractor was to report the schedule change in writing. Id.

B.      Schuyler's Technical Proposal

Schuyler's technical proposal offered two different vessels to meet the Solicitation requirements, a "[p]rimary [v]essel" and an "[a]lternative [v]essel." Tab 21, AR 460, 463, 465 (Schuyler Proposal). The primary vessel was identified as the MV EOT Spar (EOT Spar), a "twin-screw, single-hold, self-sustaining [roll-on/roll-off] Cargo vessel." Id. at AR 463. The alternative vessel was identified as the barge Columbia Houston and the tug Atlantic Coast (Columbia Houston). Id. at AR 465. Schuyler's proposal explicitly stated that the Columbia Houston would be provided "as required to ensure uninterrupted service to GTMO." Id.

At issue in this protest is the section of Schuyler's technical proposal dedicated to the schedule sub-factor. Plaintiff contends that Schuyler's proposed liner schedules do not comply with the Solicitation's northbound schedule requirements. Pl.'s Mot. 7–8.

Per the Solicitation instructions, see Tab 15, AR 140, Schuyler submitted a written narrative describing how it intended to meet the requirements of the schedule sub-factor, Tab 21, AR 485–86. The written narrative for the schedule sub-factor states in relevant part:

> [Schuyler's] proposed schedule is based on the required sailing schedule and using the EOT Spar, with vessel departing Jacksonville, Florida every other Friday, arriving GTMO the following Tuesday, sailing Wednesday, calling Port Au Prince, Norfolk, and then arriving Jacksonville Thursday for the next loading (i.e., within 14 days). Commencing the first week of February

(February 6th, 2015), the schedule then would repeat itself until the contract is complete. Our proposed schedule for the contract meets the requirements of PWS 3.B.4, and provides for evenly distributed service through the contract period of performance . . . . [T]he EOT Spar will run about three days to GTMO and about 7-8 days back after calling Port Au Prince, Haiti and Norfolk, with one day at each load and discharge port, and thus completing the round trip voyages well within the required parameters with the option to call Port Au Prince, Haiti and Norfolk. The schedule includes a 10% weather factor. When the barge Columbia Houston is used, the schedule would be Jacksonville-GTMO-Jacksonville . . . .

Currently, [Schuyler] has a regular service serving Haiti, Central America - US Gulf/US East Coast. . . . Given that our person[nel], contractors and equipment are already in place, expansion of service to call at GTMO can be readily accommodated. . . . <u>Flexibility and reliability are [e]nsured for continuous operation by having two vessels able to serve the contract as required</u>.

<u>Id.</u> (emphasis added).

Also per the Solicitation instructions, <u>see</u> Tab 15, AR 140, Schuyler submitted proposed liner schedules that purported to meet the requirements of Section 3.B.4 of the PWS, Tab 21, AR 486–87. Schuyler submitted a "[s]ample" sailing schedule for both the EOT Spar and the Columbia Houston. <u>Id.</u> The relevant portions of the sample schedule for the EOT Spar are as follows:

| Day 1 (Thurs. PM): | Vessel arrives Load Port Jacksonville, Florida per SDDC[7] Schedule |
|---|---|
| Day 2 (Fri. PM): | Commence Sea Voyage from Jacksonville to GTMO |
| Day 4 (Mon. PM) [Day] 5 (Tues.): | Vessel arrives Naval Station GTMO (vessel will be GTMO basis new working hours as per solicitation) |
| Day 5 (Tues): | Vessel departs GTMO |
| Day 6 (Weds.) Day 11 | Call Port Au Prince, Haiti and sail the same day - .5 days port time Call Norfolk and sail the same day - .5 days port time |
| Day 13-14: | Vessel arrives Discharge-Load Port Jacksonville per SDDC Schedule • about 13 days (not to exceed 14) after departing Port of Jacksonville, vessel is ready / in position for next load out |

[7]    SDDC stands for Military Surface Deployment and Distribution Command, which is a component of TRANSCOM and "provides for liner service of containerized and breakbulk cargo between Jacksonville/Blount Island, Florida and U.S. Naval Station Guantanamo Bay, Cuba (GTMO)." Tab 15, AR 182 (Solicitation).

Id. at AR 486–87 (footnote added).  The relevant portions of the sample schedule for the Columbia Houston are as follows:

| Day 1: | Vessel arrives Load Port Jacksonville, Florida per SDDC Schedule |
| Day 2 (Fri. PM): | Commence Sea Voyage from Jacksonville to GTMO |
| Day 7 (Weds.): | Vessel arrives Naval Station GTMO (vessel will GTMO basis new working hours as per [solicitation]). |
| Day 8 (Thurs.): | Vessel departs GTMO |
| Day 13: | Vessel arrives Discharge - Load Port Jacksonville per SDDC Schedule<br>• about 13 days (not to exceed 14) after departing Port of Jacksonville, vessel is ready / in position for next load out |

Id. at AR 487.  Both sample schedules were identified as "weather permitting."  Id.  In addition to the sample schedules, Schuyler included maps that chart the roundtrip voyages for both the EOT Spar and Columbia Houston.  Id. at AR 488.

C.     Evaluation of the Offerors' Technical Proposals and the Source Selection Decision

Two offerors, TransAtlantic and Schuyler, timely submitted proposals.  Tab 76, AR 1276 (Source Selection Decision Document).  A Source Selection Evaluation Board (SSEB) Technical Evaluation Team was responsible for evaluating the offerors' technical proposals.  Tab 39, AR 658 (Tech. Eval. Narrative).  The Technical Evaluation Team was comprised of four members (including the Team's Chairperson, Randy Ellis), representing both the United States Navy and the Military Surface Deployment and Distribution Command (SDDC).  Id.  The Technical Evaluation Team rated both Schuyler's and TransAtlantic's technical proposals as acceptable.  Id. at AR 659.

After determining that both proposals were acceptable on each of the non-price factors, the SSEB conducted a price analysis of the offerors' total proposed prices.  Tab 76, AR 1276.  The contracting officer held discussions with both offerors based on unreasonable price proposal determinations, and both submitted final price revisions.  Id. at AR 1276–77.  Schuyler ultimately proposed a price that was $4,028,467.00 less than TransAtlantic's proposed price, and the SSEB determined that Schuyler's proposal represented the best value to the government.  Id. at AR 1277.

The Source Selection Authority (SSA) "reviewed the evaluation results of the SSEB and verified that the SSEB's evaluation process followed the . . . solicitation evaluation criteria and that the ratings were appropriately and consistently applied."  Id. at AR 1276.  After a "thorough[] review[] [of] the SSEB analysis and award

7

recommendation," as well as a "review[] [of] the solicitation and the documentation supporting the SSEB report," id., the SSA concurred with the SSEB's evaluation and best value determination, id. at AR 1276–77. The SSA concluded that Schuyler was "the low-priced offeror, [was] a VISA participant, has an Acceptable Technical Capability rating, an Acceptable Past Performance rating, and an Acceptable Information Assurance & Cyber Security rating and [its] proposal represents the best value to the Government." Id. at AR 1277. Accordingly, the SSA ordered the award of the contract to Schuyler. Id.; see also Tab 78, AR 1285 (Award dated March 9, 2015); cf. Tab 15, AR 141 ("Award will be made to the lowest priced responsible offeror meeting or exceeding the requirements for technical capability, past performance, information assurance, and VISA participation.").

D.     Procedural History

On March 16, 2015, after learning that it had not been awarded the contract, TransAtlantic filed a protest at the Government Accountability Office (GAO). Tab 84, AR 1520–37 (GAO Protest). TransAtlantic raised several challenges to the agency's award decision, including a challenge similar to the one currently before the court—specifically, that Schuyler's technical proposal failed to comply with the Solicitation's schedule requirements and therefore, it should have been rated as unacceptable. See generally id.; see also Tab 87, AR 1791–96 (TransAtlantic's Comments on Agency Rpt.) (arguing that "Schuyler's multiple liner schedules" did not meet the Solicitation's schedule requirements). The GAO was unpersuaded by TransAtlantic's "objection to Schulyer's use of two slightly different schedules for its two vessels":

> [I]n light of the fact that multiple vessels could be utilized during performance, and consistent with the PWS provision that the contractor maintain "vessel schedules" in the integrated booking system, we find TRANSCOM's consideration of Schuyler's two, slightly-different schedules—both of which comply with the PWS—to be completely reasonable. That TransAtlantic argues for a more restrictive interpretation of the PWS schedule requirement does not demonstrate that the agency's evaluation was flawed.

Tab 91, AR 1930 (TransAtlantic Lines, LLC, B-411242, B-411242.2 (Comp. Gen. June 23, 2015)). The GAO rejected each of TransAtlantic's remaining arguments in turn, and denied TransAtlantic's protest. See id. at AR 1924–37.

TransAtlantic filed its protest in this court on July 1, 2015. Compl., ECF No. 1. TransAtlantic argues that the agency's decision to rate Schuyler's technical proposal as acceptable "lacked a rational basis and was arbitrary, capricious, and an abuse of

discretion." Pl.'s Resp. 2.  In plaintiff's view, "[a]n ordinary reading of the Solicitation's plain language and Schuyler's proposal confirms that Schuyler did not offer what the Solicitation required, and its proposal, therefore was unacceptable for Contract Award." Id.; see id. at 5 ("Schuyler's proposal failed to meet the material schedule terms of the Solicitation, and TRANSCOM ignored this in its evaluation.").  But for this alleged error, TransAtlantic argues that it "would have inevitably received the Contract award because its proposal was fully compliant and properly rated as technically 'Acceptable.'"  Pl.'s Mot. 21.

II.     Legal Standards

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract."  28 U.S.C. § 1491(b)(1) (2012).

The court reviews an agency's procurement decision to determine whether the decision is supported by the administrative record.  See RCFC 52.1.  The applicable standard of review for the court's examination of an agency's decision is set forth in the Administrative Procedure Act (APA).  See 28 U.S.C. § 1491(b)(4).  In accordance with this standard, the court will set aside a decision by the agency only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2012).  A procurement decision may be set aside only if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation, or procedure.  Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Application of the arbitrary and capricious standard is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). The court is particularly deferential to the agency's technical evaluation.  L-3 Commc'ns EOTech, Inc. v. United States, 87 Fed. Cl. 656, 664 (2009); see E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (stating that "such matters as technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess"); Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals.").

To survive a challenge based on arbitrariness and capriciousness, an agency's decision need only have been "the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'"  JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n.8 (2002) (quoting Baltimore Gas & Elec. Co. v.

9

Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)), aff'd, 56 F. App'x 474 (Fed. Cir. 2003); see Pitney Bowes Gov't Solutions, Inc. v. United States, 94 Fed. Cl. 1, 11 (2010) ("Mindful of its role on review, the court will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). The court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co. (Motor Vehicle), 463 U.S. 29, 43 (1983).

When interpreting a government solicitation, the court must apply the governing principles of contract interpretation. Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004). Thus, the court must begin with the plain language of the solicitation. Id. "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning . . . ." Id. The court must also interpret the solicitation as a whole, "in a manner that harmonizes and gives reasonable meaning to all of its provisions." Id.; see also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

III.    Discussion

Both parties agree that this is a simple case. Def.'s Mot. 1; Pl.'s Resp. 1. The sole issue in dispute is whether the agency reasonably determined that Schuyler's technical proposal complied with the Solicitation's schedule requirements.[8] See Pl.'s Resp. 1. For the following reasons, the court concludes that Schuyler's technical proposal met the minimum requirements of the Solicitation. Plaintiff has therefore failed to establish that the agency acted arbitrarily and capriciously in assigning Schuyler's technical proposal

---

[8]     Both parties also agree that if the court finds in favor of plaintiff on the merits, that an injunction would be an appropriate remedy. Def.'s Mot. 10 n.2; Pl.'s Resp. 2 n.1.

an acceptable rating.[9]  Cf. Tab 15, AR 143 (stating that acceptable rating would be assigned if the "[p]roposal clearly [met] the minimum requirements of the solicitation").

As plaintiff correctly suggests, Pl.'s Mot. 20–21, applicable federal procurement law requires that agencies evaluate proposals and make awards "based solely on the factors specified in the Solicitation," 10 U.S.C. § 2305(b)(1) (2012); see FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the Solicitation.").  "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."  E.W. Bliss Co., 77 F.3d at 448; see Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 (Fed. Cir. 2009) ("[A] proposal that, on its face, leads 'an agency to the conclusion that an offeror could not and would not comply with [a material term of solicitation] is technically unacceptable and may not form the basis for an award.'" (quoting Chapman Law Firm v. United States, 63 Fed. Cl. 519, 527 (2005), aff'd, 163 F. App'x 889 (Fed. Cir. 2006))).  However, "[w]here a defect in a [proposal] is trivial or a mere formality, not material, the [proposal] is not required to be rejected out of hand." E.W. Bliss, 77 F.3d at 449 (first alteration in original) (quoting M.W. Kellogg Co./Siciliana Appalti Costruzioni v. United States, 10 Cl. Ct. 17, 26 (1986)).

"A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal]."  Blackwater Lodge & Training Ctr., Inc. v. United States (Blackwater), 86 Fed. Cl. 488, 505 (2009); see Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) ("De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are.").  A court should "only overturn an agency's determination that an offeror's [proposal] satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious."  Blackwater, 86 Fed. Cl. at

---

[9]     The court also rejects plaintiff's argument that the agency "waive[d] the requirement that offerors submit a technically compliant proposal."  Pl.'s Resp. 13; see also id. at 11 (arguing that "[a]n agency's failure to explain its decision to give a technically acceptable rating to a non-compliant proposal [has been] held to be arbitrary, capricious, and an abuse of discretion" (discussing Naplesyacht.com, Inc. v. United States, 60 Fed. Cl. 459, 471 (2004))).  Because the court concludes that Schuyler submitted a technically compliant proposal, plaintiff's argument rests on a faulty premise.

505; Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 260 (2010) ("[A]n agency's determination that a proposal is acceptable may be deemed arbitrary and capricious if the proposal did not provide what was called for in the solicitation.").

The parties' arguments center around two material terms contained in the Section 3.B.4 of the PWS:  (1) that northbound sailings occur on a "fixed-day-of-the-week," and (2) that departures from GTMO occur, "at a minimum, every 14 calendar days."  Tab 15, AR 184; cf. Pl.'s Resp. 6 (characterizing these schedule requirements as "material Solicitation terms"); Pl.'s Mot. 16 (similar).[10]

As detailed above, see supra Part I.B, the narrative portion of Schuyler's technical proposal explains that the EOT Spar, its primary vessel, would "sail[]" from GTMO on Wednesdays.  Tab 21, AR 485.  Schuyler also provided proposed schedules for both the EOT Spar and its alternative vessel, the Columbia Houston.  The proposed schedule for the EOT Spar provided that the vessel would "depart[]" from GTMO on Tuesdays, and the proposed schedule for the Columbia Houston provided that the vessel would "depart[]" from GTMO on Thursdays.  Tab 21, AR 486–87.

Plaintiff takes three exceptions to Schuyler's technical proposal:

> First, Schuyler failed to commit to a fixed day to depart from GTMO when using [the EOT Spar] (indicating Tuesdays or Wednesdays).  Second, Schuyler proposed a different day entirely for GTMO departures when using [the Columbia Houston] (Thursdays). Third, Schuyler's proposed two-vessel solution for performing the Contract violates the Solicitation's requirement that sailings depart from GTMO at least every 14 days (switching from a Tuesday or Wednesday departure every other week to a Thursday departure every other week will necessarily require a 15- or 16-day period between GTMO departures).

Pl.'s Resp. 7–8 (footnotes omitted); see also Pl.'s Mot. 8–9.

Defendant characterizes plaintiff's arguments as "trifling quibbles," Def.'s Mot. 8, and argues that plaintiff simply misunderstands the role that Schuyler's proposed liner schedules played in its technical proposal, id. at 9.  Defendant contends that Schuyler's proposed schedules were "sample schedules" that "were not set in stone."  Id.  In defendant's view, "they contained flexibility and they could be adjusted."  Id.

---

[10]     Defendant does not dispute plaintiff's contention that these are material terms of the Solicitation.

Plaintiff counters that its "protest relates to material deficiencies in Schuyler's proposal, which go to the very essence of the liner service requirement." Pl.'s Resp. 2. Plaintiff asserts that the Solicitation required offerors to submit a fixed, not flexible, schedule. See id. at 8–9. Thus, plaintiff claims that Schuyler's "flexible" schedules run afoul not only of the Solicitation but also "the very nature of a liner service contract, which consists of '[r]epeated sailings at regular intervals . . . maintained between the same designated ports.'" Pl.'s Mot. 3 (some alterations in original) (quoting Lane C. Kendall, The Business of Shipping 7 (1973)[11]); see also id. at 4 (advising that, '[b]y definition, a liner service is a regular route on a fixed schedule"); Pl.'s Resp. 6 ("In the context of a liner service contract, a fixed sailing schedule is one of—if not the most important—aspects of contract performance.").

A.    Use of Two Proposed Schedules

The court first addresses plaintiff's contention that Schuyler's "proposed two-vessel solution" violates the Solicitation's terms that vessels depart from GTMO on a "fixed-day-of-the-week basis" at least every 14 days. See Pl.'s Mot. 18–19; Pl.'s Resp. 7–8. For the reasons stated below, the court concludes that the agency's determination that Schuyler's technical proposal met the material requirements of the Solicitation was not arbitrary and capricious.

As an initial matter, the court observes that plaintiff does not take issue with the fact that Schuyler proposed two vessels. See Pl.'s Resp. 8 ("TransAtlantic does not contest Schuyler's ability to propose a second vessel . . . ."). Indeed, the Solicitation contemplates that offerors would propose more than one vessel to meet the contract requirements. See Tab 15, AR 140 (instructing offerors to "identify the vessel(s) . . . to be utilized for this contract"). Rather, plaintiff argues that in order to comply with the Solicitation's material terms, "the second vessel must meet the same regularly scheduled service as proposed for the first vessel." Pl.'s Resp. 8; see also Pl.'s Mot. 8 ("[O]fferors could have proposed multiple vessels so long as each vessel departed Jacksonville and GTMO on the same 'fixed-day-of-the-week' . . . ."). However, reading both the Solicitation and Schuyler's proposal as a whole, the court finds that Schuyler's use of slightly different schedules for its primary and back-up vessels was not inconsistent with the material terms of the Solicitation. That is, the fact that Schuyler's proposed schedules for the EOT Spar and Columbia Houston have different northbound sailing days does not run afoul of the Solicitation's schedule requirement that northbound sailings take place on a fixed-day-of-the-week. Nor does the fact that more than fourteen days may pass

---

[11]    The Business of Shipping is attached as Exhibit 1 to plaintiff's memorandum in support of its motion for judgment on the administrative record. ECF No. 9-1.

between northbound sailings when both the EOT Spar and the Columbia Houston are used in succession run afoul of the Solicitation's requirement that the frequency of the sailings occur at least every fourteen days.

As defendant correctly observes, Schuyler's proposed schedules for both the EOT Spar and the Columbia Houston "individually met the departure, arrival, and transit requirements specified in the [S]olicitation." Def.'s Reply 3. Each proposed schedule provided for northbound "[s]ailings . . . on a fixed-day-of-the-week basis" to occur "at a minimum, every 14 calendar days," with a maximum transit time of eighteen days, as required by the plain language of Section 3.B.4 of the PWS. See Tab 15, AR 184. And, the Technical Evaluation Team clearly concluded as much. See Tab 39, AR 662 (Tech. Consensus Rpt.) (stating that both the "sample sailing schedule [for the] EOT Spar" and the "sample backup vessel sailing schedule for [the] Columbia Houston" met the requirements of Section 3.B.4 of the PWS); see also Tab 80, AR 1410 (Ellis Decl.) (stating that "Schuyler's proposed schedule for both the EOT SPAR and [the Columbia Houston] was identified and discussed" by the Technical Evaluation Team).

Schuyler stated that its ability to offer two vessels capable of meeting the Solicitation's sailing requirements would ensure "[f]lexibility and reliability" and "continuous operation" of service. Tab 21, AR 485–86. Schuyler clearly identified the EOT Spar as its primary vessel and the Columbia Houston as a second, alternative vessel, to be used "as required to [e]nsure uninterrupted service to GTMO." Id. at AR 460, 465; see also id. at 383 ("Our offer proposes the MV EOT Spar as [the] primary vessel for the liner service."); cf. Pl.'s Mot. 9 (acknowledging same). There is simply no support for plaintiff's contention that "Schuyler proposed to perform the [c]ontract using two different vessels with two different schedules interchangeably." Pl.'s Mot. 3.

To be clear, the court rejects plaintiff's argument that Schuyler's proposal allowed it "unilateral discretion to switch vessels—and therefore schedules—at whim." Pl.'s Resp. 8 n.5; see also Pl.'s Mot. 20 (attempting to characterize Schuyler as a "bus company [that] does not provide bus riders with any information as to which bus will be running at any given time, thus rendering the two different schedules essentially useless for planning"). The Solicitation requires contractors to "provide and continually maintain vessel schedules in the Integrated Booking System (IBS) at least 45 calendar days in advance of the vessel sail date." Tab 15, AR 184; cf. id. at AR 201 (further providing that "[i]f the Contractor wishes to materially change its service, the Contractor must submit to the Contracting Officer not later than 60 calendar days prior to the anticipated change a written request detailing such change and the impact on the service provided"). If the contractor anticipated a change in the vessel schedule, the contractor was instructed to notify the order officer and update the schedule in the IBS within seven calendar days

prior to the next scheduled port call.  Id. at AR 184.  If the contractor anticipated a "slippage in scheduled sailing date/arrival date by more than one . . . calendar day," the contractor was to report the schedule change in writing.  Id.  Thus, Schuyler could not simply alternate between schedules "at whim."  The Solicitation provides that offerors must provide at least 45 days advance notice of any proposed schedule changes, and nothing in Schuyler's proposal suggests that it sought to do otherwise.

The record reflects that the Technical Evaluation Team viewed the EOT Spar as Schuyler's primary vessel and the Columbia Houston as its back-up vessel.  See Tab 39, AR 662 (Tech. Consensus Rpt.)[12] (referring repeatedly to the "prime vessel" and "backup vessel"); see also Tab 32, AR 630 (Smith Tech. Eval.) (referring to "both the primary and alternative vessel").  The record also reflects that the Technical Evaluation Team acknowledged that the Columbia Houston would be used only if the EOT Spar was unavailable.  Tab 34, AR 638 (Hagan Tech. Eval.) (stating that "[t]he additional availability [of the Columbia Houston] should ensure [un]interrupted service between JAX/GTMO in the event the primary vessel is unavailable").  The court finds reasonable the agency's view that Schuyler's proposed schedule for the Columbia Houston, as a backup vessel, would be used only if the EOT Spar was unavailable.  See Motor Vehicle, 463 U.S. at 43 (stating that the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

Because Schuyler's proposed schedule for its primary vessel clearly meets the material requirements of the Solicitation, Schuyler's submission of a back-up schedule for the Columbia Houston—which differs slightly from that of its primary vessel, but also meets the material requirements of the Solicitation—does not mandate a conclusion that the agency should have rated Schuyler's technical proposal as unacceptable.  Accordingly the court will not overturn the agency's determination that Schuyler's technical proposal met the material requirements of the Solicitation.  See Blackwater, 86 Fed. Cl. at 505 (stating that a court should "only overturn an agency's determination that an offeror's [proposal] satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious"); cf. Tab 15, AR 143 (stating that a proposal would be assigned an acceptable rating if it "clearly meets the minimum requirements of the solicitation").

> B.     EOT SPAR Northbound Departure Discrepancy

---

[12]     The court observes that the Technical Consensus Report on Schuyler's schedule sub-factor is adopted verbatim from the Technical Evaluation of the Chairperson of the Technical Evaluation Team, Randy Ellis.  Compare Tab 39, AR 662 (Tech. Consensus Rpt.), with Tab 33, AR 636 (Ellis Tech. Eval.).

The court now turns to the discrepancy between Schuyler's narrative, which states that the EOT Spar would "sail[]" from GTMO on <u>Wednesdays</u>, and its proposed northbound schedule, which states that the EOT Spar would "depart" from GTMO on <u>Tuesdays</u>. Tab 21, AR 485–86. Plaintiff contends that, "[t]his facial ambiguity alone demonstrates the arbitrary and capricious nature of the Agency's acceptance of Schuyler's technical proposal." Pl.'s Mot. 8. "To the extent the proposal reserves a right to depart on either day," plaintiff argues, "it violates the [Solicitation] requirement that sailings be on a 'fixed-day-of-the-week.'" <u>Id.</u> at 17.

Defendant maintains that no discrepancy exists between Schuyler's narrative and the EOT Spar sample schedule. <u>See</u> Def.'s Mot. 8; Def.'s Reply 4 n.1. According to defendant, "[d]eparting a port is different than sailing on a voyage; Schuyler's proposal demonstrated that it would leave port on Tuesday evening, and commence 'sailing' at sea the next day." Def.'s Mot. 8. However, defendant neither cites to, nor does the record reflect, any support for this position. Accordingly, the court rejects this argument.

Defendant argues in the alternative that Schuyler's narrative explicitly included "a 10% weather factor," and observes that "[t]en percent of a 14-day journey is approximately a day and a half—the difference between the narrative and [the EOT Spar] sample schedule[]." Def.'s Mot. 8. While this may well be a reasonable explanation for the discrepancy between Schuyler's narrative and its proposed schedule for the EOT Spar, it is not one that the court can attribute to the agency. And "[a] court may not accept counsel's <u>post hoc</u> rationalizations for agency action, but must find support for the agency's action in the decision of the agency itself." <u>Williams v. United States</u>, 116 Fed. Cl. 149, 159 (2014) (citing <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 50).

As discussed above, <u>supra</u> Part I.A, the Solicitation instructed offerors to submit a written narrative for the schedule subfactor that was to "demonstrate the offeror's understanding of the requirements identified in the [PWS]." Tab 15, AR 141. The Solicitation also instructed offerors to submit "a proposed liner schedule that meets the departure, arrival and transit requirements as specified in Section 3.B.4 of the PWS." <u>Id.</u> at AR 140. The Solicitation advised that the agency would evaluate the technical capability factor by examining the "the degree to which the information provided by the offeror in its proposal demonstrates the offeror's ability to provide the equipment and resources needed to successfully accomplish the objectives of the [PWS], as well as manage, supervise, and perform the required services in accordance with the PWS." <u>Id.</u> at AR 143.

The Solicitation did not require offerors to submit a contractually binding liner schedule. Rather, the Solicitation required offerors to submit a "<u>proposed</u> liner

schedule." Id. at AR 140 (emphasis added); see Am. Heritage Dictionary 1406 (4th ed. 2000) (defining "propose" to mean "[t]o put forward for consideration, discussion, or adoption; suggest"); cf. Bortone v. United States, 110 Fed. Cl. 668, 678 (2013) ("Dictionaries can serve as the basis for determining the plain meaning [of a term]." (citing Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 408 (2008)). Moreover, the Solicitation advised that "[t]he [g]overnment reserve[d] the right to . . . incorporate all, part or none of the offeror's written proposal in to the resultant contract." Tab 15, AR 137; see Banknote, 365 F.3d at 1353 (Fed. Cir. 2004) (stating that the court "must consider the solicitation as a whole, in a manner that harmonizes and gives reasonable meaning to all of its provisions"). Thus, the Technical Evaluation Team's treatment of Schuyler's proposed schedule as a "sample" schedule comports with the terms of the Solicitation. See Tab 39, AR 662 (Tech. Consensus Rpt.) (referring to the "sample sailing schedule [for the] EOT Spar"); cf. Def.'s Mot. 9 (claiming that Schuyler's "sample schedules . . . were not set in stone").

Per the Solicitation instructions, Schuyler submitted a written narrative describing the EOT Spar's sailing schedule and a "[s]ample" schedule for the EOT Spar. Tab 21, AR 486. Schuyler's "[s]ample" schedule met the material requirement in Section 3.B.4 of the PWS that "[s]ailings shall be on a fixed-day-of-the-week basis," Tab 15, AR 184, and Schuyler's narrative clearly "demonstrate[d] [Schuyler's] understanding of the [PWS] requirements," id. at AR 141. The court finds nothing arbitrary and capricious about the agency's determination that Schuyler's technical proposal met the material terms of the Solicitation. The record simply does not support plaintiff's contention that the discrepancy in departure dates between Schuyler's narrative and the sample schedule of the EOT Spar was an attempt by Schuyler to "reserve[] a right to depart on either day." Pl.'s Mot. 17.

The record reflects that the Technical Evaluation Team neither addressed nor acknowledged the discrepancy in Schuyler's proposal. However, in light of the fact that the Solicitation did not require contractually binding liner schedules—and in light of the fact that Schuyler's written narrative and proposed schedule individually complied with the Solicitation—the court finds this discrepancy to be, at most, a de minimis error in Schuyler's proposal. See Grumman Data Sys. Corp., 88 F.3d at 1000 ("De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."); E.W. Bliss, 77 F.3d at 449 ("[W]here a defect in a [proposal] is trivial or a mere formality, not material, the [proposal] is not required to be rejected out of hand" (quoting M.W. Kellogg Co., 10 Cl. Ct. at 26)). Thus, to the extent that "the evaluators excused, waived or ignored this discrepancy," as plaintiff alleges, see Pl.'s Mot. 17, the court finds that the agency did not abuse its discretion in doing so, L-3

Commc'ns, 87 Fed. Cl. at 664 ("The court gives great deference to an agency's technical evaluation of an offeror's proposal.").  And, to the extent that the evaluators entirely failed to recognize its existence, the court considers this failure to be insufficient grounds for disturbing the agency's award to Schuyler.  In sum, the court concludes that the agency's determination that Schuyler's technical proposal met the minimum requirements of the Solicitation was not arbitrary and capricious.  See Blackwater, 86 Fed. Cl. at 505 (stating that a court should "only overturn an agency's determination that an offeror's [proposal] satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious"); cf. Tab 15, AR 143 (stating that a proposal would be assigned an acceptable rating if it "clearly meets the minimum requirements of the solicitation").

IV.    Conclusion

        Further to the foregoing, and based on a thorough and careful review of the record, the court concludes that the agency rationally rated Schuyler's technical proposal as acceptable.  Plaintiff's motion is therefore **DENIED**, and defendant's motion is **GRANTED**.  The Clerk of Court shall enter judgment for the government.  No costs.

        IT IS SO ORDERED.

                                        s/ Patricia E. Campbell-Smith
                                        PATRICIA E. CAMPBELL-SMITH
                                        Chief Judge

## CERTIFICATE OF SERVICE

I certify that, on this 6th day of October, 2015, a true and correct copy of the

foregoing Appellant's Brief was served through the Court's CM/ECF filing system

on Defendant's counsel of record, as follows:

> Mr. Alexander Sverdlov
> Mr. Steven M. Mager
> Commercial Litigation Branch
> United States Department of Justice
> Civil Division
> Post Office Box 480
> Washington, D.C. 20044
> Alexander.v.sverdlov@usdoj.gov
> Steven.mager@usdoj.gov

> /s/ Paul M. Honigberg
> Paul M. Honigberg
> Blank Rome LLP
> 600 New Hampshire Ave., NW
> Washington, DC 20037
> (202) 772-5800
> Honigberg@BlankRome.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, that the body of this brief, beginning with the Jurisdictional Statement on page 1 and

ending with the last line of the Conclusion on page 19, and including headings, footnotes, and

quotations, contains 4,052 words, in compliance with the type-volume limitation

of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure.

DATED:  October 6, 2015

/s/ Paul M. Honigberg
Paul M. Honigberg
Attorney for Plaintiff-Appellant
*TransAtlantic Lines, LLC*